[No. 12748. In Bank. — September 4, 1890.]

## UNITED LAND ASSOCIATION et al., Respondents, *v.* THOMAS KNIGHT, Appellant.

PUEBLO LANDS — MEXICAN GRANT — PATENT — TITLE OF SAN FRANCISCO. — The pueblo of San Francisco derived its title to its lands from the grant of the government of Mexico, and not from the United States, whose patent is not an original grant, and did not emanate from the source of title, and was not necessary to invest title in the city, but is a mere acknowledgment that the pueblo had title under the Mexican government, which existed at the cession of the territory, and is a release of all claim of the United States to the property found by its tribunals to have been so vested in the pueblo.

ID. — SURVEY. — LOCATION OF QUANTITY. — The pueblo grant of San Francisco was of a fixed and definite quantity, with boundaries established on three sides by the terms of the grant, and required a survey merely for the purpose of fixing the fourth or southern line so as to secure the given quantity, exclusive of lands held by title paramount within the exterior boundaries; but such quantity, though required, could not control the natural boundaries described, and could only be ascertained by going south for quantity.

ID. — CONCLUSIVENESS OF SURVEY AND PATENT — PRIOR RIGHTS OF THIRD PARTIES. — The survey of such grant belonged to the political department of the government, and not to the courts, and the survey and patent are conclusive upon the courts in actions of ejectment when not in conflict with the prior rights of third persons; but when such prior rights are involved, the inconclusiveness of the survey and patent may be asserted to the extent essential for the protection of such prior rights.

ID. — EJECTMENT — COLLATERAL ATTACK UPON PATENT — POWER TO CONVEY. — The courts have the right, even in actions of ejectment, when the parties present rely upon a patent from the United States, to inquire as to whether or not the description given in the patent includes land which the government or its officers had no power to convey.

ID. — CONSTRUCTION OF PATENT — QUITCLAIM — RELATION. — The patent to pueblo lands, as a conveyance, is to be construed only as a quitclaim, and takes effect by relation at the time when proceedings were instituted before the board of land commissioners for confirmation of the Mexican grant; and can convey nothing which the government of the United States had not the power to grant or confirm at the date of filing the petition for confirmation, or which was not then or thereafter vested in the United States.

ID. — PATENT AS RECORD EVIDENCE. — Though a patent for pueblo lands is record evidence of the validity of the Mexican grant under the laws of Mexico, it is valid as such record only to the extent that it conforms to the decree of confirmation with reference to the fixed natural boundaries, and to the survey made by the political or ministerial department, establishing a boundary not fixed and determined by the decree of confirmation.

ID. — POWER OF LAND DEPARTMENT — SURVEY AND PATENT CONTROLLED BY DECREE OF CONFIRMATION. — The officers of the land department have no power to include in a survey and patent to land, issued in satisfaction of a pueblo grant, land outside of the natural boundaries given in the decree of final confirmation of the grant, but are bound by the description given in the decree so far as it describes definitive boundaries.

ID. — BOUNDARIES OF PUEBLO LANDS OF SAN FRANCISCO — HIGH-WATER MARK. — The decree of confirmation of the pueblo lands of San Francisco, having described one of the definitive boundaries of such lands as being the "extreme upper portion of the peninsula above ordinary high-water mark," etc., such boundary must control the survey and patent, though the survey made under the decree fixed the boundary below the ordinary high-water mark, and the patent recited the decree confirming the grant, and in its granting clause described the boundaries of the land as fixed in the survey. (MCFARLAND, J., BEATTY, C. J., and WORKS, J., dissenting.)

ID. — EJECTMENT — EVIDENCE — LOCATION OF LANDS BELOW HIGH-WATER MARK. — Evidence is admissible in an action of ejectment to challenge the validity of such patent as a conveyance of a particular tract for the recovery of which the action is brought, on the ground that the tract is below ordinary high-water mark in a navigable arm of the bay of San Francisco, and was not embraced within the lands covered by the grant which the patent was intended to evidence, and was not land which the government or its officers had the power to convey, but consisted of land belonging to the state of California at the time of the patent.

ID. — TIDE-LANDS — TITLE OF STATE. — Lands below ordinary high-water mark belonged to the Mexican government by virtue of its sovereignty, and were no part of the pueblo lands of San Francisco; but passed to the state of California immediately upon its admission to the Union; and the government of the United States had no power to grant such lands to the city of San Francisco.

ID. — NATURE OF PUEBLO GRANT — MEXICAN LAW — RIGHTS OF GOVERNMENT — TITLE TO SEASHORE. — The pre-existing title to pueblo lands under Mexican law was never a fee, or in the nature of a private land grant, but merely vested the use of the land in the pueblo in trust for the benefit of settlers, with power as the representative of the state to make private grants to settlers, but not upon the seashore; and the fee of all the lands which had not passed into private ownership remained in the government, which was not deprived of the power of making grants to private persons within the limits of the pueblo, and retained the title to the seashore unencumbered by any power or trust conferred upon the pueblo, which title passed to the United States, and from it to the state of California, before the United States saw fit to vest the fee of the pueblo lands in the city as the successor of the pueblo.

ID. — STARE DECISIS — CASE OVERRULED. — The rule of *stare decisis* does not apply to the decision in the case of *People* v. *San Francisco*, 75 Cal. 389, so far as it determines the conclusiveness of the patent to the city of San Francisco, that question being unnecessary to the decision of that case,

LXXXV. CAL.—29

and its determination being erroneous, and in conflict with the decisions of the supreme court of the United States. (McFARLAND, J., BEATTY, C. J., and WORKS, J., dissenting.)

APPEAL from a judgment of the Superior Court of the city and county of San Francisco.

The facts are stated in the opinion of the court.

*James A. Waymire*, for Appellant.

The patent cannot be collaterally assailed in ejectment. (*People* v. *San Francisco*, 75 Cal. 389.)

*Thomas B. Bishop, amicus curiæ*, also for Appellant.

The state is not a "third person" within the act of 1851, which only relates to persons claiming titles antedating the acquisition of California. (*Waterman* v. *Smith*, 13 Cal. 420; *Moore* v. *Wilkinson*, 13 Cal. 478; *Teschemacher* v. *Thompson*, 18 Cal. 27; 79 Am. Dec. 151; *Leese* v. *Clark*, 20 Cal. 387; *Miller* v. *Dale*, 44 Cal. 562; *Hale* v. *Akers*, 69 Cal. 160; *Manning* v. *San Jacinto Tin Co.*, 7 Saw. 424; *Beard* v. *Federy*, 3 Wall. 493; *Carpentier* v. *Montgomery*, 13 Wall. 495.) The land department has exclusive jurisdiction to locate and survey a confirmed Mexican grant, and to determine the correctness of such location and survey. (*Waterman* v. *Smith*, 13 Cal. 413; *Moore* v. *Wilkinson*, 13 Cal. 478; *Biddle Boggs* v. *Merced etc. Co.*, 14 Cal. 279; *Leese* v. *Clark*, 20 Cal. 387; *Thompson* v. *Doaksum*, 68 Cal. 593; *People* v. *San Francisco*, 75 Cal. 388; *United States* v. *San Jacinto etc. Co.*, 10 Saw. 639; affirmed, 125 U. S. 273; *Maguire* v. *Tyler*, 8 Wall. 661; *Snyder* v. *Sickles*, 98 U. S. 212; *Ballance* v. *Forsyth*, 24 How. 185.) The patent is conclusive evidence against a collateral attack that the grant is accurately located by the official survey upon which such patent is based, and that the boundaries therein designated are correct. (*Moore* v. *Wilkinson*, 13 Cal. 478; *Waterman* v. *Smith*, 13 Cal. 419; *Yount* v. *Howell*, 14 Cal. 465; *Mott* v. *Smith*, 16

Cal. 533; *Teschemacher* v. *Thompson,* 18 Cal. 11; 79 Am. Dec. 151; *Leese* v. *Clark,* 18 Cal. 572; 20 Cal. 387; *Pioche* v. *Paul,* 22 Cal. 105; *Kimball* v. *Semple,* 25 Cal. 440; *Semple* v. *Hagar,* 27 Cal. 163; *Ward* v. *Mulford,* 32 Cal. 365; *Yates* v. *Smith,* 40 Cal. 662; *Miller* v. *Dale,* 44 Cal. 579; *Chipley* v. *Farris,* 45 Cal. 536; *Hale* v. *Akers,* 69 Cal. 160; *Wright* v. *Seymour,* 69 Cal. 122; *United States* v. *Flint,* 4 Saw. 61; affirmed, *sub nom. United States* v. *Throckmorton,* 98 U. S. 61; *Manning* v. *San Jacinto Tin Co.,* 7 Saw. 418; *United States* v. *San Jacinto Tin Co.,* 10 Saw. 639; affirmed, 125 U. S. 273; *West* v. *Cochran,* 17 How. 403; *Stanford* v. *Taylor,* 18 How. 412; *Beard* v. *Federy,* 3 Wall. 491; *Maxwell Land Grant Case,* 121 U. S. 325, 379, 381.) This conclusiveness attaches to such a patent as against all the world except the "third persons" mentioned in the act of March 3, 1851; but as already shown, and as was rightly decided in *People* v. *San Francisco,* 75 Cal. 388, the state and its grantees in this case are not such "third persons." The doctrine in question is not limited to cases of Mexican grants. It is a general and well-settled rule that patents for land, whether issued by the United States or by a state, are conclusive evidence upon a collateral attack of all the facts made necessary by law to their issuance, where the determination of those facts is expressly or presumptively confided to the officers issuing the patents. (*Doll* v. *Meador,* 16 Cal. 325; *Churchill* v. *Anderson,* 56 Cal. 55; *O'Connor* v. *Frasher,* 56 Cal. 499; *Sacramento etc. Co.* v. *Cook,* 61 Cal. 342; *Gale* v. *Best,* 78 Cal. 235; *French* v. *Fyan,* 93 U. S. 169; *Smelting Co.* v. *Kemp,* 104 U. S. 640; *Ehrhardt* v. *Hogaboom,* 115 U. S. 68.) The patent is conclusive evidence that the boundaries designated in the decree are correctly located by the courses and distances of the survey, even where, as a matter of fact, it could be shown by evidence *aliunde,* if the evidence were admissible, that said courses and distances do not accord with the boundaries given in the decree, but are within them or extend beyond them.

(*Teschemacher* v. *Thompson*, 18 Cal. 11; 79 Am. Dec. 151; *Ward* v. *Mulford*, 32 Cal. 365; *Chipley* v. *Farris*, 45 Cal. 527, 536; *Cassidy* v. *Carr*, 48 Cal. 339; *Yount* v. *Howell*, 14 Cal. 469; *Moore* v. *Wilkinson*, 13 Cal. 485, 487; *Leese* v. *Clark*, 18 Cal. 535; 20 Cal. 387; *People* v. *San Francisco*, 75 Cal. 388; *Manning* v. *San Jacinto Tin Co.*, 7 Saw. 418; *United States* v. *San Jacinto Tin Co.*, 23 Fed. Rep. 279, 280; *United States* v. *Flint*, 4 Saw. 61; affirmed, *sub nom. United States* v. *Throckmorton*, 98 U. S. 61; *Maxwell Land Grant Case*, 121 U. S. 325, 379, 381; see also *West* v. *Cochran*, 17 How. 403; *Stanford* v. *Taylor*, 18 How. 412; *Beard* v. *Federy*, 3 Wall. 478.) This case is not within the doctrine of *More* v. *Massini*, 37 Cal. 432. The recital of the decree in this patent does not make its boundaries controlling. The decree does not bound the land by natural monuments. Where there is a manifest intent to convey a specific quantity of land, rather than a particular tract, without regard to quantity, there is no doubt that the quantity will be the controlling element in the description, and that of two conflicting descriptions that which will give the specified quantity will be preferred to one which will not. (*Heaton* v. *Hodges*, 14 Me. 66; 30 Am. Dec. 741, note; *Moore* v. *Wilkinson*, 13 Cal. 478; *Baldwin* v. *Brown*, 16 N. Y. 359; *Townsend* v. *Hayt*, 51 N. Y. 656; *Higinbotham* v. *Stoddard*, 72 N. Y. 94, 99; *Brookman* v. *Kurzman*, 94 N. Y. 272, 276; *Danziger* v. *Boyd*, 21 Jones & S. 398; *Moran* v. *Lezotte*, 54 Mich. 83, 88, 90; *Slater* v. *Rawson*, 1 Met. 450; *Winans* v. *Cheney*, 55 Cal. 567; *Hall* v. *Shotwell*, 66 Cal. 379.) Even if the survey did not follow the decree, it may have followed it as "closely as practicable." If so it was sufficient. "Reasonable conformity" of the survey with the decree is enough to satisfy the statute; even on an appeal from the confirmation of such a survey. (*Dehon* v. *Bernal*, 3 Wall. 774, 776; *United States* v. *Armijo*, 5 Wall. 450.) The survey, being in the nature of a proceeding *in rem*, necessarily imparted

notice to all persons claiming an interest in the land. But furthermore, the state, deriving the title since the acquisition of the country by the United States, was not a "third person" within the meaning of the act of 1851, and was not entitled to notice of the proceedings. (*Teschemacher* v. *Thompson*, 18 Cal. 25; 79 Am. Dec. 151.) There is no question here of power to convey land outside of the decree of confirmation, as the patent does not purport to convey any such land; but purports to convey, and does convey, the land included by the boundaries designated in the decree as located by the survey. All land included in the patent is conclusively presumed to be within the decree. The cases cited by respondent's counsel, to the point that where a patent is located upon land which there is no power to convey evidence *aliunde* is admissible to show that the patent is so located, in whole or in part, have no material bearing here. The principle of those decisions is that a patent may be impeached by showing that the land embraced therein is, in whole or in part, land which the government has "no authority under any circumstances to convey," as where it is land previously granted to another, or is expressly excepted from the grant upon which the patent was issued, and the like. (*Carr* v. *Quigley*, 57 Cal. 394; *McLaughlin* v. *Heid*, 63 Cal. 215; *Newhall* v. *Sanger*, 92 U. S. 761; *Doolan* v. *Carr*, 125 U. S. 618; *Wright* v. *Roseberry*, 121 U. S. 488; *New Orleans* v. *United States*, 10 Pet. 731; *Polk's Lessee* v. *Wendal*, 9 Cranch, 87; *McLaughlin* v. *Powell*, 50 Cal. 64; *Southern Pacific R. R. Co.* v. *McCusker*, 67 Cal. 67; *Chicago etc. Co.* v. *Oliver*, 75 Cal. 194.) All that these cases hold may be admitted without militating in the slightest degree against the appellants' position here.

*Samuel M. Wilson, amicus curiæ,* also for Appellant.

The duty of the United States to fulfill the treaty of Guadalupe Hidalgo was a political one, and the mode

and manner of exercising that political duty rested entirely with the general government, "to be discharged in such manner and on such terms as they might judge expedient." (*Beard* v. *Federy*, 3 Wall. 492.) The land commission was not a court, and the courts used were mere instrumentalities of the political department. The action of the land department was intended to be final and conclusive, except as to the "third persons," referred to in the act of Congress. That the state of California was no "third person" is very manifest from reason, and was distinctly determined in the cases of *People* v. *San Francisco*, 75 Cal. 389; *Teschemacher* v. *Thompson*, 18 Cal. 27; 79 Am. Dec. 151; *Waterman* v. *Smith*, 13 Cal. 420; *Leese* v. *Clark*, 18 Cal. 572; *Miller* v. *Dale*, 44 Cal. 562; *Carpentier* v. *Montgomery*, 13 Wall. 495; *Manning* v. *San Jacinto Tin Co.*, 7 Saw. 424. The action of the land department, where it has power to act, cannot be reviewed or collaterally assailed in actions of ejectment. (*West* v. *Cochran*, 17 How. 403; *Willot* v. *Sandford*, 19 How. 80; *Beard* v. *Federy*, 3 Wall. 478; *People* v. *San Francisco*, 75 Cal. 388.) The distinction is obvious between a collateral attack upon the judgment of the land department, upon which a duty was imposed, and an attack upon its power to act, where it could have no jurisdiction under any circumstances, as shown in the cases of *Wright* v. *Roseberry*, 121 U. S. 488, and *Doolan* v. *Carr*, 125 U. S. 618. There is not the slightest indication, in these later decisions referred to, of any intention upon the part of the supreme court of the United States to overrule or disregard the previous decisions which had been so plain upon this question, such as *West* v. *Cochran*, 17 How. 403; *Willot* v. *Sandford*, 19 How. 80; *Beard* v. *Federy*, 3 Wall. 478.

*Philip G. Galpin*, for Respondent.

Under the law of Mexico, land below or within one hundred varas of the seashore could not be held in private ownership. (Wheeler's Land Titles, p. 13; 15 Par-

tidas, 5, in vol. 2, p. 581; Civ. Code Mexico, art. 812; Dwinelle's Col. Hist. S. F., ad., p. 42.) By her admission into the Union, the state of California became seised in fee of the lands below high-water mark as effectually as if by special grant; and since September 9, 1850, the United States could not convey these premises so vested in the state. The rule of law is settled in the federal courts, that where the United States does not hold the fee, the patent is inoperative as a conveyance. (*Wright* v. *Roseberry,* 121 U. S. 488; *Patterson* v. *Winn,* 11 Wheat. 380; *Newhall* v. *Sanger,* 92 U. S. 761.) The patent did not divest the title of the state, because it expresses on its face that the line of high tide is the boundary. The line of high tide is a natural monument. There is no recital that the courses and distances given in the patent follow the line of high tide. The proof was that they did not. The premises were below the line of high tide, but within the courses and distances. Parol proof is admissible to locate premises with reference to natural monuments. Natural monuments control courses and distances. (*More* v. *Massini,* 37 Cal. 432.) The boundaries of the grant must control the survey, unless limited by the decree of confirmation. (*Van Reynegan* v. *Bolton,* 95 U. S. 35.) The survey must be made in accordance with the decree. (*Fossat Case,* 2 Wall. 649.) A decree of confirmation giving the boundaries of a tract is conclusive as to the boundaries which it specifies. (*United States* v. *Hancock,* 133 U. S. 196.) The patent can only issue on the decree, and is in execution of the decree. (*United States* v. *Minor,* 114 U. S. 233.) The land department could not decree away the rights of the state. An officer cannot, by deciding that he has power to adjudicate into his jurisdiction land which the law does not confide to his power, so conclusively establish his right to act upon it that a third person is precluded from proving that the land was of a character or class that the officer had no jurisdiction over. (*Smelting Co.* v. *Kemp,* 104 U. S. 641;

*Wright* v. *Roseberry*, 121 U. S. 513; *Doolan* v. *Carr*, 125 U. S. 618.) The error in *People* v. *San Francisco* was in applying to a case, where the department did not have jurisdiction, the rule applicable to cases where they do have it; in deciding that, as the patent is conclusive of all matters within the jurisdiction, therefore it is conclusive upon matters which are without. If the patent be construed to deal with land belonging to the state, it is so far void, as not being within the granting power of the United States, and may be impeached collaterally. (*Steel* v. *Smelting Co.*, 106 U. S. 452; *Newhall* v. *Sanger*, 92 U. S. 761; *Carr* v. *Quigley*, 57 Cal. 395; *S. P. R. R.* v. *McCusker*, 67 Cal. 67; *McLaughlin* v. *Heid*, 63 Cal. 208; *Patterson* v. *Winn*, 11 Wheat. 380; *Stoddard* v. *Chambers*, 2 How. 318; *Easton* v. *Salisbury*, 21 How. 431; *United States* v. *Stone*, 2 Wall. 535; *Parker* v. *Duff*, 47 Cal. 565; *Stockton* v. *Williams*, 1 Doug. (Mich.) 546; *Doolan* v. *Carr*, 125 U. S. 618.)

FOX, J.— This case was first heard and an opinion thereon filed in Department. Subsequently a rehearing in Bank was granted, and after argument a decision was filed January 2, 1890. This was followed by divers petitions for a second rehearing, representing that the case was one of great public importance, involving the validity of land titles to a very considerable, and what is now a very valuable, portion of the city of San Francisco; and in view of the alleged importance of the questions involved, a rehearing was granted. Upon this hearing elaborate oral arguments have been made, and all who desired have been permitted to file printed briefs and arguments, all of which have been carefully considered, and we are still constrained to adhere to the conclusion first reached in Bank, and announced in the opinion written by Mr. Justice Paterson, *post*, p. 474.

This is not, as assumed on behalf of appellant, a case of conflict between two parties, both claiming under the

government of the United States; nor is it a case where one is claiming under patent issued by the government of the United States, and the other is a mere naked trespasser, failing to connect, himself with any paramount source of title.

The defendant, and those who are situate like him, and on whose behalf argument is here made, claim under the pueblo of San Francisco. That pueblo claimed and derived its title, not under the government of the United States, but under the government of Mexico. Its grant was not a special one, made by the supreme legislative authority of the sovereign state, but was one made by the ministerial officers of the government, under, and necessarily in conformity with, its general laws. Necessarily so, for if the ministerial officers exceeded the authority conferred upon them by law, then their act was void. It must, therefore, be assumed that the grant was only such as the ministerial officers were authorized by law to make.

The patent of the United States, invoked by the appellant, is not an original grant, does not emanate from the source of title, but is a mere acknowledgment that the pueblo had title from the Mexican government, — the predecessor of the United States, — and a release of all claim on the part of the United States to the property found by its judicial tribunals to have been so vested in the pueblo. The patent was not necessary to invest the pueblo with title, for its title existed at the cession of the territory. It was recognized by the decree of final confirmation (cited in the former opinion), and as shown by that decree it was of a fixed and definite quantity of land, with its boundary on three sides fixed and established by the terms of the original grant, and marked by the hand of nature as limited by the shores of the sea. It required to be surveyed, for one purpose only, — that of so fixing and establishing the boundary which was left undetermined by the original grant, as to secure

the given quantity, exclusive of that which was held by title paramount within the natural boundaries so fixed and the survey so made. The patent was only evidence of the pre-existing title. (*Waterman* v. *Smith*, 13 Cal. 419.) The only purpose of a survey was that of establishing the one undetermined line, the southern line, of the body of land to which the pre-existing title should attach.

In the case of this pueblo, it undoubtedly became necessary, in order to secure quantity, to make a general survey of the whole, and also a survey of the several parcels within the exterior boundaries, which were confessedly held by adverse claimants holding under paramount title; but this necessity and power existed only for the purpose of ascertaining and determining the one undetermined and uncertain boundary line, — that on the south. The right to make that survey, and establish that boundary, belonged to the political department of the government, and could not be exercised by the courts. But the court could ascertain and fix the position of the natural boundaries which were designated in the grant, and did do so. While the courts could not and cannot interfere with the action of the political department of the government in fixing the one boundary which was left undetermined by the grant as finally confirmed, they must determine whether the prior rights of third parties have been interfered with by the survey and patent issued thereon. While the survey and patent are conclusive upon the courts in actions of ejectment, they are so only when not in conflict with the prior rights of third persons, and in such actions their inconclusiveness can be asserted to the extent essential for the protection of such prior rights. (*Moore* v. *Wilkinson*, 13 Cal. 486.)

The patent, so far as it is construed as a conveyance, is to be construed only as a quitclaim, releasing to the patentee such interest as the United States possessed in

the land conveyed by the original grant, and it takes effect by relation at the time when the proceedings were originally instituted before the board of land commissioners for the confirmation thereof. As a record of the government, it is evidence that the claim asserted was valid under the laws of Mexico. (*Yates* v. *Smith*, 38 Cal. 71.) But it is valid as such record only to the extent that it conforms to the decree of the judicial department of the government in reference to those matters upon which the judicial department were empowered to decide; that is to say, the decree of confirmation, with reference to the fixed natural boundaries, and to the survey made by the political or ministerial department, establishing the only boundary which was not fixed and determined by the decree of confirmation. As a deed it can convey nothing which the government had not the power to grant or confirm at the date of filing the petition for confirmation. (See *Doolan* v. *Carr*, cited by Mr. Justice Paterson, and cases therein cited.) It certainly could convey nothing which was not at that time vested, and never afterward became vested, in the United States. And this question may be inquired into, upon collateral attack, in an action of ejectment.

In *Smelting Company* v. *Kemp*, 104 U. S. 641, the supreme court of the United States, in passing upon this question of collateral attack upon a patent in an action of ejectment, says: "If they [the lands embraced in the patent] never were public property, or had previously been disposed of, or if Congress had made no provision for their sale, or had reserved them, the department would have no jurisdiction to transfer them, and its attempted conveyance of them would be inoperative and void, no matter with what seeming regularity the forms of law may have been observed. The action of the department would in that event be like that of any other special tribunal not having jurisdiction of a

case which it had assumed to decide.   Matters of this
kind, disclosing a want of jurisdiction, may be consid-
ered by a court of law.   In such case, the objection to
the patent reaches beyond the action of the special tri-
bunal, and goes to the *existence of a subject upon which it
was competent to act.*

In the later case of *Wright* v. *Roseberry,* 121 U. S.  519,
the same court again considers the question, and not·
only quotes and approves the foregoing, but also the
following passage: " A  patent may be collaterally im-
peached in *any* action, and its operation as a conveyance
defeated, by showing that the department had no juris-
diction to dispose of the lands; that is, that the law did
not provide for selling them, or that they had been
reserved from sale, or dedicated to special purposes, or
had been previously transferred to others.   In establish-
ing any of these particulars, the judgment of the depart-
ment upon matters properly before it is not assailed, nor
is the regularity of its proceedings called into question;
*but its authority to act at all is denied, and shown never to
have existed."*

And still later, in *Doolan* v. *Carr,* 125 U. S. 618, the
same court again says: " A patent may be collaterally
impeached in any action, and its operation as a con-
veyance defeated, by showing that the department had
no jurisdiction to dispose of the lands, . . . . or that
they had been previously transferred to others."

In view of these recent and oft-repeated decisions of
the court of last resort to which the question can be
carried, there can no longer be a doubt about the right
of the courts, even in actions of ejectment, when the
parties present rely, as in this case, upon a patent
from the United States, to inquire as to whether or not
the description given in the patent includes land which
the government or its officers had no power to convey.

This being so, then, when the patent was offered in this
case, the plaintiff had a right to challenge its validity,

not perhaps as to everything that it purported to convey, but as a conveyance of a particular tract for the recovery of which the action is brought, on the ground that that tract was not embraced within the lands covered by the grant which the patent was intended to evidence, and was not on land which the government or its officers had the power to make valid conveyance. Being so challenged, it is found and conceded that the land lies, not on or near the southern boundary of the four leagues for which the grant is confirmed, — the only boundary which the ministerial officers of the government were required, authorized, or empowered to establish, — but midway between the northern and southern extremities of said four leagues, and near to but outside of the eastern boundary thereof, as said boundary had been fixed and established by the laws of the nation making the grant, and found and confirmed by the judicial department of the government in its decree of confirmation.

Was it outside of that boundary? It is *found* and at the argument *admitted* to be below *ordinary high-water mark*, in a navigable arm of the bay of San Francisco. If so, it was outside the boundary line of the grant, under the laws of the country by which the grant was made. Under the laws of that country, these lands below ordinary high-water mark constituted the beach, or seashore, and " with respect to the ownership, it pertains to the nation which is mistress of the country of which it forms a part, and, with respect to use, to all men." (Leyes, 3, p. 6, tit. 28, part 3.) The king could not alienate such lands. (See *New Orleans* v. *United States*, 10 Pet. 726, and other authorities cited by Mr. Justice Paterson.) That the government did not alienate them is established by the decree of confirmation quoted in the former opinion, by which decree it is expressly declared that the lands so granted, and of which confirmation is decreed, are bounded on the " north and the east by the bay of San Francisco, and

on the west by the Pacific Ocean." That the ministerial officers of the government were bound by the description given in that decree, so far as the decree did give definitive boundaries, and had no right to include in the patent lands outside of such boundaries, is abundantly established by the authorities cited by Justice Paterson in his opinion.

Again, the land in dispute was not land which the government had the power to grant at the date of the filing of the petition for confirmation. Not having been granted by the Mexican government before the conquest, it remained the property of the sovereign. The petition for confirmation was not filed until long after the admission of California into the Union. Immediately upon such admission, the state, by virtue of her sovereignty, became seised of the land, the same being tideland of the bay of San Francisco. The land did not, therefore, belong to the United States, and even Congress had no power to grant it to another. *Quoad* this land, the patent is absolutely void, for the reason given in *Polk's Lessee* v. *Wendal,* 9 Cranch, 87, cited on behalf of the appellant; the government in whose behalf the patent was issued had no title to the thing granted.

It is claimed on behalf of appellant that the doctrine of *stare decisis* should be applied to this case, and that when so applied, the question here involved is *res adjudicata,* under the decision of this court in *People* v. *San Francisco,* 75 Cal. 389. We do not think so. That case was decided on demurrer to a complaint which admitted on its face that the patent was in " due form of law"; was based upon a survey certified to have been made in strict conformity with instructions of the commissioner of the general land-office, which instructions had been given under the directions of the Secretary of the Interior; was issued under the great seal of the United States, and purported, by virtue of the authority of said decree of confirmation, and in pursuance thereof, to grant and

convey to the city of San Francisco the land embraced and described in the plat and survey, and including the premises within the exterior boundaries thereof. (See. page 393.) The decree itself is also copied in full into the opinion (see page 392), but did not there, as here, appear to have been a portion of the patent. It shows upon its face that the grant as confirmed was bounded on the east by a natural boundary, to wit, *ordinary high-water mark* of the bay of San Francisco (as the same existed at the date of the conquest of the country, namely, the 7th of July, 1846). This decree has been accepted and become final, and settles the question for this and all other courts, and for all other officers and tribunals, as to what was included in the grant, so far as this eastern boundary was concerned. But the court on demurrer was bound to take, as true, the allegation of the complaint, that the survey was made and patent issued "by virtue of the authority of said decree, and in pursuance thereof," and that it did "grant and convey to the city of San Francisco the tract of land" embraced and described in said plat and survey, and "including the premises within the exterior boundaries thereof." Taking these allegations to be true, the bill being *quia timet*, affirmance of the judgment which had been rendered for defendant on the demurrer necessarily followed.

But it is insisted that the case did not go off upon the proposition that these allegations must be taken as true, but the court considered and determined the broad question of the conclusiveness of the patent, as the same is here and now presented. This seems to have been the course pursued by the court, and it furnishes the strongest possible argument for refusing to accept the opinion then given as conclusive of the case at bar, for it was one not necessary to the decision of the case.

But disregarding that point, the court was not then convincing in its reasoning, or happy in its selection of authorities in support thereof. Neither of the three

recent decisions of the supreme court of the United States cited above, and referred to in the opinion of Mr. Justice Paterson, were cited by counsel or referred to by the court. It is hardly possible that the conclusion of the court in *People* v. *San Francisco*, 75 Cal. 389, as to the conclusiveness of the patent as a conveyance of land below ordinary high-water mark, could have ever been reached if the attention of the court had been called to the cases of *Smelting Company* v. *Kemp*, 104 U. S. 641; *Wright* v. *Roseberry*, 121 U. S. 519; and *Doolan* v. *Carr*, 125 U. S. 618. In fact, the two later cases were decided after the briefs were filed in *People* v. *San Francisco*, 75 Cal. 389.

One of the cases upon which the court rests it conclusion in *People* v. *San Francisco*, 75 Cal. 389, is that of *Cassidy* v. *Carr*, 48 Cal. 339. In that case the claimant held under a Mexican grant, held to be a perfect grant. It was confirmed to the extent of two leagues, and no more, although he claimed to have received juridical possession of a larger quantity. He took no appeal. In due time his two leagues were surveyed off, the survey approved, and patent issued. He accepted the patent, and then the question in the action was, whether he could still claim title to lands not included within the survey given in the patent, but claimed to have been included within the limits of his original juridical possession. The court held, that, having accepted the patent, he was estopped from claiming lands outside the boundaries of the description therein given. The question was so different from the one here involved that we are unable to see how the decision constitutes any authority upon this question whatever.

In *Moore* v. *Wilkinson*, 13 Cal. 487, another of the cases relied upon in support of that opinion, the grant was for merely four square leagues, but within a tract almost without limit as to extent or a western boundary, and the order was that " the judge who may give posses-

sion will cause the same to be measured according to the ordinance, leaving the remainder, which may result to the nation for its proper uses." Upon confirmation, approved survey, and patent, the same being for four leagues and no more, the question was, whether persons without title, but claiming to have settled within the exterior boundaries of the tract from which the four leagues was to be taken prior to the confirmation and survey, and to have filed declaratory statements as pre-emptors, could attack the patent on the ground that the patented lines did not conform to the juridical possession. The court held that in such a case they could not; that the patent was conclusive of the validity of the grant, of its confirmation, of the survey, and its conformity with the confirmation, and of the relinquishment to the patentee of all the interest of the United States in the land patented. It could hardly have held otherwise, for the survey was within the natural exterior boundaries named in the grant, of which, as in this case, natural exterior boundaries were given on three sides; and within those natural exterior boundaries no valid pre-emption claim could be made until survey and segregation of the grant. But the case is in no sense parallel to the one at bar, or the one in support of which it is cited.

*Chipley* v. *Farris*, 45 Cal. 539, is another of the cases cited in support of that decision. It, like that of *Cassidy* v. *Carr*, was a case where the grantee, having received and accepted his patent, was seeking to claim lands excluded from the patent. It was not authority for the case in which it was cited, and is not in this.

*Teschemacher* v. *Thompson*, 18 Cal. 11, 79 Am. Dec. 151, is also cited and relied upon as authority to the conclusiveness of the patent, and also that the Mexican government had power and authority to make grants of these lands. As we read that case, it does not support either of these propositions. The lands in controversy there were not within the boundaries of or near any pueblo or other

probable'seat of commerce; the great body of the land in controversy was not below ordinary high-water mark, but salt marsh, — lands above ordinary and below extraordinary high-water mark. Incidentally it was claimed, and the supreme court held, that in that case the boundary of the Mexican grant ran to ordinary low-water mark, and that the seashore having been granted by the Mexican government at that point, the state took in subordination to the grant, and that her rights were postponed to, and must abide the event of, the action of the general government in the settlement of that private land grant, and that the patent was conclusive of the fact that the land had so been granted by the former government. In that case, also, the survey was one approved by the judicial department of the government. Here the government, through its judicial department, has determined that the lands below ordinary high-water mark were *not* included in the grant, and directed that the survey be made accordingly. Not being so included, and the court having so decreed, it follows that the rights of the state were not subordinate to, or postponed to the settlement of, the grant to the pueblo.

The same may be said of *Ward* v. *Mulford*, 32 Cal. 365, also cited in support of that decision. It was almost on all fours with *Teschemacher* v. *Thompson*, and was decided on the authority of that case. In that case, as in· the other, both the grant and the survey thereof had been confirmed by the judicial department of the government, and included the salt marsh. The court properly held that where the Mexican government had, before the conquest, granted those lands, the rights acquired by California by virtue of her sovereignty were subordinate to the grants so made. There is nothing in the conclusion reached now, or on the former hearing of this case in Bank, in conflict with these authorities. The difference is found in the facts. There it was adjudged in and by the decree of confirmation that the

lands in dispute had been granted by the Mexican government before the conquest; here it has been adjudged and determined in and by the decree of confirmation that they had *not* been so granted. The adjudication in both cases is final.

The only remaining case cited in support of the opinion in *People* v. *San Francisco* is that of *Leese* v. *Clark*, 18 Cal. 574, and 20 Cal. 425. All that was decided in that case bearing upon the case at bar was, that "the defendants, taking whatever interest they possess in subordination to the future action of the government . . . . in determining the location of the older grant, are in no position to question these proceedings"; and that "the term 'third persons' refers not to all persons other than the United States and the claimants, but to those holding independent titles arising previous to the acquisition of the country." Both of these propositions may be accepted as true, but they do not militate against the view we have taken of this case. The plaintiffs in this case, it is true, do not claim by virtue of an older grant from the Mexican government. What they claim is, that the *locus in quo* was never granted, and under its laws could not have been granted, by the ministerial officers of the government of Mexico; that this fact is established, not only by reference to the laws of Mexico, but also by the final adjudication of the courts of the United States in and by the decree of confirmation of the grant which was made; that not having been granted, it remained, at the date of the conquest, the property of the nation, and passed as such to the United States; that the United States having made no grant thereof, upon the admission of California into the Union, September 9, 1850, it became the property of the state by virtue of her sovereignty, and the United States could not thereafter make a valid grant thereof. The state did not take in subordination to the older grant, and her rights were not postponed until the settlement of the rights of the

older grantee, for there was no older grant in any manner affecting the property; none which included it even within its exterior boundaries.  And on all the authorities this conclusion seems to be correct.

*Teschemacher* v. *Thompson* and *Ward* v. *Mulford* may be accepted as authority for the proposition that the Mexican government could, and sometimes did, make grants covering the salt marsh lying between the high lands and the seashore, —the lands between the high-water mark of extraordinary tides at the full of the moon, or spring-tides, and the ordinary high-water mark of the tides in their daily ebb and flow; and even sometimes extended the grant'below ordinary high-water mark; but that fact does not prove that she could or ever did make grants of lands lying on the seashore, *below the ordinary high-water mark of the daily ebb and flow of the tides,* within the boundaries of a pueblo.  In *People* v. *San Francisco* the court says: "No authority has been cited in support of the statement that, by the law of Mexico, tide-lands could not be included within pueblo lands." That may have been true, but the court failed to mark the distinction between "tide-lands" and "seashore"; between lands made productive by the occasional overflow of the tides, and lands made barren by the regular and daily overflow thereof.  Of the one it had before it two examples of the fact, established by decree of the federal courts, that the Mexican government could and sometimes did grant them; of the other, no example has ever been furnished where the government made such a grant within a pueblo.  That it did not make a grant of such lands in this case is attested by the decree of confirmation.  In support of the proposition that a pueblo could not own land below ordinary high-water mark, the court was then cited to, and we again cite, Dwinelle's Colonial History of San Francisco, addend. 42; Wheeler's Land Titles of San Francisco, 13; Civ. Code of Mexico, art. 802; Domat, b. 7, tit. 8, sec. 1, art. 1; Hall's Mexican Law,

sec. 1466; *New Orleans* v. *United States,* 10 Pet. 662; *Mayor* v. *Metzinger,* 1 Mart. 297; *Milne* v. *Girodeau,* 12 La. 324.

There being no grant to which the rights of the state were subordinate, and to the settlement of which the rights of the state were postponed, she became vested with the title immediately upon her admission into the Union. Thereafter there was no power in the government of the United States to make a grant of the land, and the act of its ministerial officers in including it within the survey and patent of a grant theretofore made was in excess of their jurisdiction, in violation of the decree of confirmation, and void. The patent, so far as these lands were concerned, was in effect but the execution of the decree of confirmation. (*United States* v. *Minor,* 114 U. S. 242.) "When a decree gives the boundaries of a tract to which the claim is confirmed with precision, and has become final, it is conclusive not only on the question of title, but also as to the boundaries which it specifies." (*United States* v. *Hancock,* 133 U. S. 196.) And it was the duty of the surveyor in making survey of the claim finally confirmed to "follow the decree of confirmation as closely as practicable, whenever [and wherever] such decree designates the specific boundaries of the claim." (*United States* v. *Hancock,* 133 U. S. 196; sec. 7 of the Act of Congress of July 1, 1864; 13 Stats. 334.)

Surely if a ministerial officer, in executing a decree which fixes specific boundaries, includes land excluded by the decree from those boundaries, his act can have no force or validity as a conveyance, and especially so if the party executing the conveyance has no title.

As in *Jones* v. *Martin,* 13 Saw. 317, so here, the meander line down the coast was necessary for the purpose of ascertaining quantity; "but when done, it was the shore line as fixed by nature and shown upon the

ground, and not the meander line as run by the surveyor, that determined the boundary of the grant."

But there is still another aspect in which this case may be viewed. We have spoken of the rights of this pueblo as a pre-existing title.

That pre-existing title was never a fee under the Mexican law. A grant to a pueblo was not "a private land grant" in the sense which took title out of the state. It was the mere vesting in the pueblo, a political subdivision of the state, of the *use* of the land in trust for the benefit of the inhabitants thereof, and with power, as the representative of the state, to make grants which should vest title in private ownership of *solares*, or house-lots, and *suertes*, or sowing-lots, to settlers; the remainder to remain vacant,to the end that gifts thereof might be made to new settlers. These grants, as they are generally called, did not deprive the state itself of the right, at any subsequent period, of making what are technically denominated "private land grants," vesting title in natural persons, of any portion of the lands lying within the four leagues of the pueblo which had not already passed into private ownership; and this power on the part of the state was not unfrequently used. It was notably so used, in several instances, within the pueblo of San Francisco, and the grants so made by the state within the pueblo have been recognized and confirmed. And as hereinbefore shown, the power of the pueblo to make grants that should vest title in private ownership, unlike that of the state, did not extend to that of making grants upon the seashore. The fee of all the land which had not passed into private ownership remained always in the government, and that upon the seashore was unencumbered by the trust or power conferred upon the pueblo. The result was, that upon the conquest, all the property upon this peninsula which had not already passed into private ownership became part of the public domain of the United States, and subject to the same

laws as affected other portions of the public domain. But in executing or carrying out the provisions of the treaty of Guadalupe Hidalgo, our government, adding the features of our own town-site laws, saw fit to vest in the successor of the pueblo the fee of that over which before the pueblo had exercised power only as the agent of the sovereign. The land thus became subject to the combined trusts created by the Mexican law relating to pueblos, and the American law relating to town sites. In this sense, and this only, the patent from the United States became a grant, but as such it could convey nothing which had at the conquest become a part of the public domain, unencumbered with the trust resting in the pueblo, and being so a portion of the public domain, unaffected as aforesaid, had by the laws of the United States passed out of the federal government before the making of the patent.

It is claimed on behalf of appellant that *quantity* was the controlling element in the decree of confirmation. It is enough to say that while quantity was required, and the claimant was entitled to quantity, it was no more controlling than the natural boundaries on the north, east, and west fixed by the decree, and the decree itself gave leave to go south for quantity. But it did not give leave to go north, east, or west for quantity, even if the government had possessed lands of its own in those directions, which it had power to appropriate to make up quantity.

In view of what was said in the former opinion, which this is not intended either to supersede or modify, but merely to supplement, it does not seem necessary to further extend this discussion. After a careful review of all the authorities cited and arguments made, we still adhere to the conclusion reached in said former opinion in Bank, that the judgment of the court below must be affirmed.

So ordered.

Sharpstein, J., and Paterson, J., concurred.

Thornton, J., concurring. — In whatever point of view this case may be regarded, I am of opinion that the evidence was admissible to show that the land in controversy was situated below the ordinary high-water mark of the bay of San Francisco, as it existed on the seventh day of July, 1846.

Whatever the right of the pueblo was to the land, for which confirmation was sought by the city of San Francisco, it was never held to extend below the ordinary high-water mark of the bay. It was so adjudged by the decree of confirmation entered in May, 1865. The act of Congress of March 8, 1865, ratified the decree as it was made and entered.

If there was no judicial determination binding on the state fixing a different boundary from that of high-water mark as determined by the decree, the evidence above referred to, in my judgment, was clearly admissible. As the decree adjudges to the city nothing beyond high-water mark, evidence was admissible to locate this line so as to show that the land sued for was outside of that line.

In my opinion, the patent which sets forth the decree shows no different determination as to this line from that set forth in the decree itself. The patent shows the only other determination insisted on; and this, when rightly construed, does not vary from the decree. To rightly construe the patent, the whole of it must be taken into view; and regarding all its parts, high-water mark should be held to be the controlling call, to which course and distance must yield. The patent is but the execution of the decree. (*United States* v. *Minor*, 114 U. S. 241, 242.) The survey and the patent are made to carry out its provisions. The maxim that public officers are presumed to do their duty comes in aid of the view that the line of high-water mark is the controlling call.

The officers who made the survey and issued the patent should not be presumed to have gone beyond the decree which they were to carry out, if it can be justly held that their acts show that they are consistent with its requirements. (See *More* v. *Massini*, 37 Cal. 432–436, and *Jones* v. *Martin*, 13 Saw. 317.)

I adhere to my concurrence in the opinion of Justice Paterson, delivered on the previous hearing of this case, and will add, that I perceive nothing in the opinion of Justice Fox inconsistent with the opinion of Justice Paterson. With these views, I must hold that the judgment should be affirmed.

McFarland, J., dissenting. — I dissent. I could not express my views of the question involved in an original opinion as satisfactorily to myself, and certainly not as satisfactorily to others, as they are expressed in the deliberate opinion of this court delivered by Mr. Justice McKinstry in the recent case of *People* v. *San Francisco*, 75 Cal. 338. The reasoning of that opinion, and the authorities therein cited, are, to my mind, unanswerable and conclusive. It is said that in that opinion the court was not happy in its selection of authorities, and that it ought to have been controlled by *Doolan* v. *Carr*, 125 U. S. 618, *Wright* v. *Roseberry*, 121 U. S. 488, and *Smelting Co.* v. *Kemp*, 104 U. S. 641. But it happens that all the authorities cited in *People* v. *San Francisco* dealt with *the very matters involved in this case,* — that is, with rights claimed under Mexican grants, with the conclusiveness of United States surveys and patents in such cases, and with powers exercised under the act of March 3, 1851, and subsequent acts, to ascertain and settle such claims in the state of California. On the other hand, *Doolan* v. *Carr* merely decides that the United States land department has no power to issue a patent to a railroad company for land as "public land" which lies within a Mexican grant. *Wright* v. *Roseberry* merely decides that

when land has been segregated and identified as swamp-land, a United States patent issued for it afterward is worthless; and as to *Smelting Company* v. *Kemp,* it merely holds that a patent to a mining claim cannot be attacked collaterally in a court of law. , I cannot possibly see how any of these cases have any bearing whatever on the power of the United States government under the treaty with the Mexican government to determine the rights of land claimants under the latter government by any methods, and through any tribunals which she may choose to adopt for that purpose. As to any rights which the state of California had at the time of that treaty, it is sufficient to say that she had not then been born.

Moreover, the case of *People* v. *San Francisco* was decided after the fullest argument and consideration, having been heard twice, and as it established a rule of property, it is a case to which, in my judgment, the rule of *stare decises* should be strictly applied. I think, therefore, that the judgment in the case at bar should be reversed.

BEATTY, C. J., and WORKS, J., concurred in the dissenting opinion of Justice McFarland.

The following is the opinion above referred to, delivered upon the first hearing in Bank on the 2d of January, 1890:—

PATERSON, J.—This is an action of ejectment to recover a block of land lying below ordinary high tide in the city and county of San Francisco, and being a portion of that part of San Francisco known as "Mission Creek lands." The defendant claims under a patent of the United States to the city, issued June 20, 1884, in satisfaction of a pueblo grant of four square leagues, which was confirmed by the decree of the United States circuit court, May 18, 1865. The tract confirmed by this decree is described as "a tract situated within the

county of San Francisco, and embracing so much of the extreme upper portion of the peninsula above ordinary high-water mark (as the same existed at the date of the conquest of the country, viz., 7th of July, 1846), on which the city of San Francisco is situated, as will contain an area of four square leagues; said tract being bounded on the north and east by the bay of San Francisco, on the west by the Pacific Ocean, and on the south by a due east and west line drawn so as to include the area aforesaid,"—subject, however, to certain deductions for lands previously reserved or dedicated to public use by the United States.   Under the decree referred to, a survey was made, and on August 13, 1868, was approved by the United States surveyor-general for the state of California, which fixed the southern boundary of the land by following the high-water mark; thus excluding the lands of Mission Creek, of which the land in suit is a part.   Subsequently, in 1884, the Secretary of the Interior caused another survey to be made, one line of which ran directly across the mouth of Mission Creek; thus including the lands of Mission Creek as a part of the grant to the city.   The patent to the city recites the decree confirming the grant.   Plaintiffs' claim of title is based upon a deed from the tide-land commissioner to Ellis, dated November 24, 1875, and subsequent conveyances to them.   They contend that the state, upon its admission into the Union, by virtue of its sovereignty, became seised of the land, it being tide-land.   This right of the state, they claim, is recognized by the decree confirming the grant to the city.   It is claimed that the patent is bound to follow the decree in fixing the boundary at high-water mark, and that so much of the patent as attempts to convey lands below high-water mark is void because in excess of the authority of the officials issuing the patent.

Appellant contends that a party in an ejectment suit cannot question the validity of a United States patent

for land upon the ground that it does not follow the decree confirming the grant; that the patent from the United States government to the city and county of San Francisco for the pueblo lands confirmed to it under the acts of Congress of March 3, 1851, and of July 1, 1864, by the decree of the United States circuit court, which patent conforms in its description of the lands granted to the final survey, made, as provided in the latter act, in accordance with the instructions of the commissioner of the general land office, is conclusive evidence, as against the state of California and its grantees, of the right of the city and county to all the lands embraced within the exterior limits of the survey, including tide-lands lying below the line of ordinary high tide. It is said that the question is no longer an open one in this state. The case of *People* v. *San Francisco*, 75 Cal. 388, is cited and relied on in support of this contention. It did not appear in *People* v. *San Francisco*, 75 Cal. 388, whether the decree of confirmation was made a part of the patent. In this case it is shown that the patent contains full recitals of the decree, and shows upon its face that the tract confirmed embraced " so much of the extreme upper portion of the peninsula above ordinary high-water mark (as the same existed at the date of the conquest of the country, viz., 7th of July, 1846), on which the city of San Francisco is situated, as will contain an area of four square leagues," etc. It shows that three sides of the tract are bounded by natural monuments, namely, " on the north and east by the bay of San Francisco, on the west by the Pacific Ocean, and on the south by a due east and west line drawn so as to include the area aforesaid." If it be conceded, however, that the decision referred to covers the questions involved as fully as is claimed by the appellant, we feel satisfied that the supreme court of the United States would not follow it in this case or any other, involving the same questions, which might go to that court on a writ of

error. " It has always been the practice here to adopt that view of a legal question which has been taken by the supreme court of the United States, when the question is within the branch of the jurisdiction of that court which may be exercised by writ of error to this court." As the question is a federal question, it is one which will be decided ultimately by the supreme court of the United States. (*Belcher* v. *Chambers,* 53 Cal. 635.)

The question involved in this case is, whether the officers of the land department had power to patent land outside of the natural boundaries given in the decree of confirmation. If the land department had no jurisdiction to act, if any portion of the land described in the patent was not a part of the public domain, or if there was no legislation authorizing its conveyance by the land department, then, under the decisions of the United States supreme court in *Doolan* v. *Carr,* 125 U. S. 618, and other cases therein cited, the patent is inoperative to pass the title; and objection can be taken to it on these grounds at any time, and in any form of action.

Upon her admission into the Union, the state of California became the owner, by virtue of her sovereignty, of all tide-water lands within her borders lying below high-water mark, except such as had been disposed of by the Mexican government prior to the treaty of Guadalupe Hidalgo. The territory acquired from Mexico was by the express terms of that treaty taken by the United States subject to the trust of protecting all legal and equitable interests of prior grantees under the former sovereign. The state, of course, could not take more than the United States received; and the claim of the state, by virtue of her admission and her sovereignty, was subordinate to such prior equities, and subject to the power of the federal government to confirm prior Mexican grants, and to locate grants of specific quantities of land within the exterior boundaries of larger tracts. (*Lux* v. *Haggin,* 69 Cal. 255.) The

United States government has exercised the power vested in it, and has, through its courts and the officers of its land department, attempted to define the boundaries of the four leagues of land to which the city of San Francisco, as successor in interest of the pueblo of San Francisco, a Mexican citizen, was entitled. The court, having jurisdiction to hear and determine the right of this claimant, finally confirmed its claim to four square leagues of land in the extreme end of the peninsula, giving, as the boundaries thereof, on the west, the north, and the east, the natural lines of high-water mark, leaving the southern boundary to be fixed by the surveyor on such a line as would include, between it and the high-water lines north of it, said four square leagues of land. This, it seems, the surveyor did not do; but, ignoring the natural boundaries fixed by the court in its decree for the west, north, and east, ran his line below the line of high tide, and across the mouth of Mission Creek, and included within his description the lands described in the complaint, — lands of the state not included within the decree of confirmation. Following the survey, the patent describes the land by metes and bounds.

The government of the United States is in duty bound to carry into effect the stipulations contained in the treaty of Guadalupe Hidalgo; but the power to do so must be exercised in the manner provided by Congress; and it would seem that when Congress vested in the federal courts the power to determine the rights of Mexican claimants, and provided (section 7) that in making the survey the surveyor-general should "follow the decree of confirmation as closely as practicable, whenever such decree designates the specific boundaries," and that "it shall be the duty of the commissioner of the general land-office to require a substantial compliance with the directions of the section before approving any survey and plat forwarded to him," that the officers of the land department are, as to such lands, merely auxiliary to the

court, with special and limited jurisdiction to carry out its decrees. Section 13 of the act of 1851 (9 U. S. Stats. 631) provides that "the patent shall issue to the claimant upon his presenting to the general land-office an authentic certificate of confirmation, and a plat or survey of said land, duly certified and approved by the surveyor-general, whose duty it shall be to cause all private land claims which shall be finally confirmed to be accurately surveyed, and to furnish plats of the same; and in the location of said claims the said surveyor-general shall have the same power and authority as are conferred on the register of the land-office by section 6 of the act to create the office of surveyor of the public lands of the state of Louisiana, approved March 3, 1831. Under this provision, we think it clear that the power of the surveyor-general is restricted to the claim as finally confirmed. It has been decided in several cases, on appeal from decrees of confirmation, that the description must be followed; that "the decree is a finality, not only on the question of title, but as to the boundaries which it specifies." (*United States* v. *Halleck,* 1 Wall. 455; the *Fossat Case,* 2 Wall. 649; *Higueras* v. *United States,* 5 Wall. 829; *Van Reynegan* v. *Bolton,* 95 U. S. 35.) In *Higueras* v. *United States,* the court declared that "confirmation must precede the survey which is made subject to such an order; and, if the decree of confirmation is so indefinite and incongruous that it cannot be executed, then it is void, and of no effect, and the claim to the land stands upon the same footing, in legal contemplation, as a claim which was never presented to the commissioners for adjudication." In the *Fossat Case* the court held that it was not competent for the district court to depart from its own decree in the exercise of the power conferred by the act of June 14, 1860; that the court was bound to execute the decree by fixing the lines of the grant in conformity with the provisions of the decree, the decree being not only the foundation of the

validity of the grant, but of the proceedings in the survey and location of the land confirmed. In that case, as in this, the decree provided for specific boundaries on three sides of the tract, and left one side to be surveyed. If the court, which then had the power to supervise and confirm or reject the survey, as the land department now does, could not alter or depart from the specific boundaries given in its own decree, how can the officers of the land department?

These cases, to be sure, were direct appeals to the supreme court of the United States; but they bear directly upon the question of the authority of the officers of the land department to patent lands outside of the boundaries of the decree of confirmation, and that is the question here. If the land granted is not within the power of the officer, the grant or patent is invalid. In *Polk's Lessee* v. *Wendal*, 9 Cranch, 87, Chief Justice Marshall said: " There are cases in which a grant is absolutely void, as where the state had no title to the thing granted, or where the officer had no authority to issue the grant." In *New Orleans* v. *United States*, 10 Pet. 662, 731, the court said: " It would be a dangerous doctrine to consider the issuing of a grant as conclusive evidence of right in the power which issued it. On its face it is conclusive, and cannot be controverted; but if the thing granted was not in the grantor, no right passes to the grantee." So in this case, unless Congress has given the land department power to dispose of land belonging to the state of California, — lands lying outside of the boundaries of the decree, — a patent to land shown to be outside of such decree is invalid. In *Wright* v. *Roseberry*, 121 U. S. 488, it appeared that land which had been previously granted to the state by the swamp-land act was held by the defendant under a patent from the United States issued on a pre-emption claim. The court held the patent to be invalid as a conveyance, because the land was not, at the time it was patented to

the defendant, within the granting power of the land-office. The state of California took the lands in controversy in 1850, as effectually as if she had received them by grant from Congress. If the land department had the power to determine that land outside of the decree of confirmation should be conveyed, it would necessarily have the power to pass on its own right to convey the land, but the decree of confirmation was the foundation of the power to make the patent. It precedes and limits the power of the officers of the land department. If the latter are not limited by the decree, then the court may confirm a tract in one place, and the officers locate it in another, and the patent which attempts to convey the latter tract controls the former. This cannot be, for the whole power of deciding what shall be granted in pursuance of the treaty is intrusted to the judicial department. Section 7 of the act of 1864 (13 U. S. Stats. 334) shows that the power of the land department is limited by the provisions of the decree: "It shall be the duty of the surveyor-general of California, in making surveys of private land claims finally confirmed, to follow the decree of confirmation as closely as practicable, whenever such decree designates the specific boundaries of the claim; but when such decree designates only the out-boundaries within which the quantity confirmed is to be taken, the location shall be made, as near as practicable, in one tract, and in a compact form, . . . . and it shall be the duty of the commissioner of the general land-office to require a substantial compliance with the directions of this section before approving any survey and plat forwarded to him." Here is an emphatic declaration by Congress that the decree is the limit of the power of the land department, and shows very clearly, we think, that Congress has not given to the officers of the land department the exclusive and final power of determining whether any land is within or without the location of the decree, or of locating grants

in places where the courts have not located them. If such power is not conferred upon the land department, any attempt to convey land outside of the permanent boundaries named in the decree is not an error of judgment simply, but is an act " void for want of jurisdiction."

Under the laws of Mexico, existing at the time of the treaty, lands above and within one hundred and ninety varas of the seashore could not be held in private ownership (Wheeler on Land Titles, 13); and the land officers of the United States could not, in the absence of a judicial adjudication that such land belonged to a Mexican claimant, convey to him. "All that place is called 'seabeach' which is covered by the waters of the sea when at its highest point during all the year." (Hall's Mex. Law, 448.) The king could not alienate such lands. (*New Orleans* v. *United States,* 10 Pet. 726; *Milne* v. *Girodeau,* 12 La. 324.) The shore of the sea is that part of the land covered by water in its greatest ordinary flux, the ports, bays, roadsteads, and gulfs, and the rivers, although they may not be navigable (Mission Creek is navigable), their beds, mouths, and the salt marshes. (Hall's Mex. Law, 448–503; Mex. Civ. Code, art. 802.)

A patent cannot be issued by the land department to a person not named in the decree, because the courts, and not the department, are given the power to determine the person to whom the lands were granted by Mexico. If the judgment of the court should decree that the grant is a forgery, and therefore void, and the land department should patent the land claimed, the action of the department would be shown to be void upon the production of the decree, because Congress has given to the courts jurisdiction to determine the validity or invalidity of the claim. Of course, in cases where the court, by its decree, has established the validity of the grant, and a tract of a certain number of acres has been confirmed to be located within the exterior limits of a larger tract, it is left to the officers of the land

department, in their discretion, to locate and survey the requisite number of acres within the larger tract; and their action in execution of the decree is not subject to attack in any collateral proceedings, because it is within their jurisdiction, and in pursuance of the decree. In such cases there cannot possibly be any conflict between their action and the directions of the decree. It is auxiliary to the decree, and as conclusive as the decree itself. Unless we bear in mind the distinction between cases of this kind — the confirmation of a certain number of acres to be located within the exterior boundaries of a larger tract, and designated by the supreme court of the United States as "floats" — and cases in which the boundaries, or some of them, are definitely fixed by the decree, the decisions upon the subject will appear to be very conflicting. An examination of the authorities cited at the argument of this case, and the argument of *People* v *City and County of San Francisco*, with this distinction in view, will illustrate the principle stated, and explain what would otherwise seem to be a conflict of decisions on the subject. In *Moore* v. *Wilkinson*, 13 Cal. 478, relied on by parties claiming under the patent from the United States, the court regarded the grant "as conveying an interest to four leagues lying within a larger tract." (Page 486.)

It is true, the patents, in some cases, seem to have gone beyond the boundaries of the *deseño*, and yet they were held not to be void; but it was so held in each case because the parties attacking the patent had no title to land lying outside of the exterior boundaries, and were not, therefore, in a position to attack the validity of the patent. In *Doolan* v. *Carr* the court held (only Waite, C. J., dissenting), that one who had not even connected himself with the paramount source of title might question the validity of the patent. (125 U. S. 618.) In *Ward* v. *Mulford*, 32 Cal. 369, the district court, as it had the right to do under the law then applicable to its

decrees, had reviewed the survey and confirmed it. Even if its action were irregular, it was not void. But at the time the grant before us in this case was confirmed, the surveyor was not required to report his action to the court for confirmation, and no report was made.

In *Chipley* v. *Farris*, 45 Cal. 539, the patent covered only a portion of the tract described in the decree, but not the land in controversy. Plaintiff had no legal title, because no patent had been issued to him under the decree. The question as to the power of the land department to patent lands outside of the boundaries of the decree was not involved. Within the boundaries of the decree it may act. Without the boundaries it has no jurisdiction. Furthermore, in that case, the descriptions were both by metes and bounds, and it is expressly admitted by respondent in that case, in his written points, that if the side lines of the tract in controversy were the seashore, a different rule would apply. In *Teschemacher* v. *Thompson*, 18 Cal. 11, 79 Am. Dec. 151, the court assumed that the grant was of "a specific quantity lying in an area of larger extent." (Page 24.) In *Cassidy* v. *Carr*, 48 Cal. 339, there was no conflict between the decree and the patent. The survey and patent, as the court said, simply carried out the decree, and were conclusive between the parties. Of course, where "the survey and patent but carry out the decree," the patent is conclusive between the parties. In none of the cases cited is the question of the power of the officer to issue a patent for land not embraced in the decree considered. It does not follow logically that because the patent is conclusive in all cases where the land department had jurisdiction it is conclusive as to all lands lying without the boundaries of the decree, as well as within them. The surveyor cannot incorporate into the decree lands not confirmed, nor can he shift on the surface of the earth the natural boundaries, — mountains, bays, or oceans. The presumption always is, doubtless, that the metes and

bounds follow the decree; but to hold that the positions of the natural monuments are indisputably fixed by the courses and distances of the surveyor, and approval of the land officers, would be placing a construction upon the acts of Congress never intended by that body, and not warranted by the decisions of the national courts. The land department has power to do what the court cannot do, viz., locate, survey, and patent tracts of land designated by the court within larger areas; and when a rancho is confirmed by name to fix its boundaries, but when the court itself, in its decree, fixes one or more of the boundary lines, the department has no jurisdiction to go beyond it. The distinction between the different kinds of grants is clearly and fully stated in *United States* v. *McLaughlin*, 127 U. S. 428, and in *United States* v. *Curtner*, 38 Fed. Rep. 1.

In *Doolan* v. *Carr*, 125 U. S. 618, the court said: "There is no question as to the principle that where the officers of the government have issued a patent in due form of law, which on its face is sufficient to convey the title to the land described in it, such patent is to be treated as valid in actions at law, as distinguished from suits in equity, subject, however, at all times, to the inquiry whether such officers had the lawful authority to make a conveyance of the title. But if those officers acted without authority, if the land which they purported to convey had never been within their control, or had been withdrawn from that control at the time they undertook to exercise such authority, then their act was void,— void for want of power in them to act on the subject-matter of the patent, — not merely voidable. In which latter case, if the circumstances justified such a decree, a direct proceeding, with proper averments and evidence, would be required to establish that it was voidable, and should therefore be avoided. The distinction is a manifest one, although the circumstances that enter into it are not always easily defined. It is nevertheless

a clear distinction, established by law, and it has been often asserted in this court that even a patent from the government of the United States, issued with all the forms of law, may be shown to be void by extrinsic evidence, if it be such evidence as by its nature is capable of showing a want of authority for its issue." Under this and other decisions, including many decisions of this court (*McLaughlin* v. *Powell,* 50 Cal. 64; *McLaughlin* v. *Heid,* 63 Cal. 208; *Southern Pac. R. R. Co.* v. *McCusker,* 67 Cal. 67; *Chicago etc. Mining Co.* v. *Oliver,* 75 Cal. 194, quoted approvingly in *Wright* v. *Roseberry,* 121 U. S. 488), the evidence offered and admitted was competent, relevant, and material, and fully sustained the findings of the court. The deeds to Ellis, and evidence of the location on the earth's surface of the line of high tide, were properly admitted.

Now, if it be true, as a matter of law, that the surveyor-general had no power to include in a survey any land the claim to which was not confirmed by the decree of the circuit court, and that neither the commissioner of the land-office nor the Secretary of the Interior had any power to direct or approve such a survey, the only question is, which of the west, north, and east boundary lines respectively shall prevail,— those given in the decree, and recited in the patent, or those given in the survey, and employed in the granting clause of the patent? In determining this question, there is no violation of the principles which forbid a collateral attack upon such instruments. There is no such attack. It becomes simply a question of construction. Both descriptions are upon the face of the patent, and the case is one in which the plaintiffs claim that the defendant's title depends upon a deed describing the property by natural boundaries, and also by metes and bounds; that the description by metes and bounds includes land not included within the natural boundaries, and which defendant claims to own, but which is in fact owned by

plaintiffs; that their title should be quieted because the natural and permanent boundary lines should prevail over the description by metes and bounds. A determination of this question will in no way affect the location of the south line. By the decree, the surveyor was to fix that line; but if the surveyor had run his line through the bay of San Francisco, and taken in lands of the state lying below the high-water mark on the eastern shore of the bay, or lands lying in the foothills of the county of Contra Costa, would it be contended that the patent, although reciting the decree confirming four leagues on the peninsula of San Francisco, with the bay of San Francisco as the eastern line thereof, is conclusive evidence, as against the state or its grantees, of the right of the city and county of San Francisco " to all the lands embraced within the exterior limits of the survey, including tide-land lying below the line of ordinary high tide," and in fact conclusive against everybody as to all lands included in the survey, wherever located? If the plaintiff in the case supposed would not be prevented from showing that the metes and bounds included land belonging to him, not confirmed by the decree, and which the land officers could not convey, why may he not show the same thing in this or any other kindred case? In *More* v. *Massini*, 37 Cal. 432, the court said: "The call for the seashore as the southern boundary must be regarded as the more definite and certain, and will prevail over a call for a mere station and over the courses and distances."

But whether we consider it as a collateral attack or a mere matter of construction, it is clear, we think, that under the decisions of the supreme court of the United States in *Doolan* v. *Carr*, 125 U. S. 618, and other cases there cited, "want of power in an officer of the land-office to issue a land patent may be shown in an action at law by extrinsic evidence, although the patent has been issued with all the forms of law required for a

patent of public land." There were no errors in the rulings of the court. The evidence shows beyond doubt that the land in controversy is outside of the natural boundaries of the decree. The judgment is therefore affirmed.

WORKS, J., FOX, J., and SHARPSTEIN, J., concurred.

THORNTON, J., concurred in the judgment.

McFARLAND, J., dissented.